**UNITED STATES DISTRICT COURT FOR THE**
**WESTERN DISTRICT OF OKLAHOMA**

| | |
|---|---|
| FIRST MORTGAGE COMPANY, LLC, | ) |
| | ) |
| **Plaintiff,** | ) |
| | ) |
| **v.** | )    Case No. CIV-21-47-G |
| | ) |
| STRATEGIC MORTGAGE | ) |
| FINANCE GROUP, LLC et al., | ) |
| | ) |
| **Defendant.** | ) |

## <u>OPINION AND ORDER</u>

Now before the Court is the Motion for Summary Judgment (Doc. No. 47) filed by

Defendants Strategic Mortgage Finance Group, LLC, Jim Cameron, and Jeff Babcock.

Plaintiff First Mortgage Company, LLC has responded in opposition (Doc. No. 50).

Defendants have replied in further support of their Motion (Doc. No. 51).

### I.    *Standard of Review*

Summary judgment is a means of testing in advance of trial whether the available

evidence would permit a reasonable jury to find in favor of the party asserting a claim.  The

Court must grant summary judgment when "there is no genuine dispute as to any material

fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).

A party that moves for summary judgment has the burden of showing that the

undisputed material facts require judgment as a matter of law in its favor.  *Celotex Corp.*

*v. Catrett*, 477 U.S. 317, 322 (1986).  To defeat summary judgment, the nonmovant need

not convince the Court that it will prevail at trial, but it must cite sufficient evidence

admissible at trial to allow a reasonable jury to find in the nonmovant's favor—i.e., to show

that there is a question of material fact that must be resolved by the jury. *See Garrison v. Gambro, Inc.*, 428 F.3d 933, 935 (10th Cir. 2005). The Court must then determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986).

Parties may establish the existence or nonexistence of a material disputed fact by:

- citing to "depositions, documents, electronically stored information, affidavits or declarations, stipulations . . . , admissions, interrogatory answers, or other materials" in the record; or

- demonstrating "that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact."

Fed. R. Civ. P. 56(c)(1)(A), (B). While the Court views the evidence and the inferences drawn from the record in the light most favorable to the nonmoving party, *see Pepsi-Cola Bottling Co. of Pittsburg, Inc. v. PepsiCo, Inc.*, 431 F.3d 1241, 1255 (10th Cir. 2005), "[t]he mere existence of a scintilla of evidence in support of the [nonmovant's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [nonmovant]." *Liberty Lobby*, 477 U.S. at 252.

II.    *The Summary Judgment Record*

A. *FMC and American Southwest*

Ronald Joe McCord ("McCord") was the chairman of Plaintiff First Mortgage Company, LLC ("FMC"), a mortgage lending and loan servicing company whose primary

2

business was originating,[1] selling, and servicing mortgage loans.  McCord Dep. 61:2-14, 89:11-90:4 (Doc. Nos. 74-1, 74-2, 74-3, 74-4); Cameron Dep. 89:11-90:4 (Doc. No. 74-5).[2]  FMC is an Oklahoma limited liability corporation with its principal place of business in Oklahoma City, Oklahoma.  Am. Compl. ¶ 1 (Doc. No. 12); Answer ¶ 1 (Doc. No. 22); Engagement Letter (Doc. No. 47-2) at 1.  At all relevant times, McCord owned all or substantially all of FMC.  *See* McCord Dep. 13:15-14:7.

American Southwest Mortgage Corporation and American Southwest Mortgage Funding Corporation (collectively, "American Southwest") provided residential warehouse lending—i.e., a line of credit through which American Southwest loaned money to FMC and other lenders to fund residential mortgages.  *See* Defs.' Mot. at 6-7 & n.1; McCord Dep. 24:2-20, 27:10-17; Bisarek Dep. 17:9-25, 22:11-23:2 (Doc. No. 74-8).  FMC used American Southwest as its warehouse lender from 2000 to 2017.  McCord Dep. 24:8-20.  Under the terms of its agreements with American Southwest, FMC was required to secure loan notes by delivering them to American Southwest when FMC originated a loan and to repay the loan amount to American Southwest when the note was sold, refinanced, or paid off.  *See id.* at 24:23-28:24; Defs.' Mot. at 7 n.2.

---

[1] FMC's loan origination business was also known as its "production platform."  Pl.'s Resp. at 8; *see* McCord Dep. 96:6-97:11, 105:17-106:17.

[2] Plaintiff, on behalf of all parties, submitted the complete transcripts of several depositions for the Court's use.  In order to comply with electronic filing size limitations, Plaintiff divided certain transcripts into separate exhibits.  *See* Tr. Submissions (Doc. No. 74) at 1 n.1.  The Court cites to these depositions using the page numbers in the original transcripts.

An "out-of-trust" loan is one where a lender does not hold the title or mortgage and so is not entitled to ownership or proceeds from the loan. McCord Dep. 21:3-15; Bisarek Dep. 16:25-17:13. Prior to March 2016, FMC had sold certain American Southwest-initiated mortgage loans "out-of-trust" by failing to repay American Southwest when those loans were refinanced or otherwise paid off by homeowners. McCord Dep. 76:10-17, 186:17-187:1; *see also* Bisarek Dep. 16:25-20:7, 25:15-26:2. McCord eventually assigned or liquidated at least $14 million in assets to pay down FMC's debt to American Southwest from those out-of-trust loan sales. *See* McCord Dep. 76:10-77:8, 177:23-178:5, 193:7-25.

By August 2016, American Southwest had stopped fully funding certain of FMC's construction loans, creating liquidity problems for FMC. *Id.* at 160:15-161:2; Bisarek Dep. 21:3-15. The liquidity problems were so severe that by the end of 2016, FMC was "performing cash management triage" and began using money from borrower escrow accounts to cover FMC's operating expenses. Bisarek Dep. 26:9-27:24.

B. *FMC's Retention of STRATMOR*

In June or July of 2016, McCord contacted Defendant Strategic Mortgage Finance Group LLC ("STRATMOR"), a consulting firm that provides merger and acquisition services to the mortgage industry, to discuss FMC's options "in terms of either raising additional capital via selling the company as a whole or look at possibly selling assets, which would have included selling the production platform." McCord Dep. 96:8-97:11. On September 1, 2016, FMC and STRATMOR executed an Engagement Letter regarding STRATMOR's provision of transaction advisory services to FMC. *See* Am. Compl. ¶ 9; Answer ¶ 9; Engagement Letter at 1-7. The Engagement Letter governs the duties,

4

responsibilities, and scope of STRATMOR's services to FMC.  Cameron Dep. 20:25-21:7; McCord Dep. 97:25-98:4.

The Engagement Letter provided that "FMC does not have sufficient capital to take full advantage of . . . opportunities as they arise" and that "[FMC] Management has determined that a sale of the Company might be in their long term best interests." Engagement Letter at 2.  According to the letter, STRATMOR would "represent the Shareholders [of FMC]" "in serving as [FMC's] exclusive transaction advisor" and STRATMOR employees Jim Cameron ("Cameron"), Jeff Babcock ("Babcock"), and Mike Mayer would staff the matter.  *Id.* at 2-4.

The Engagement Letter recites several "overarching objectives" of the agreement. *See id.* at 2-3.  The Engagement Letter also lists nine specific tasks for which STRATMOR would have "primary responsibility":

1. Conduct a thorough review and analysis of [FMC] based on a review of financial and operational information provided by Management. . . . .
2. Compile a list of target buyers for review with the Shareholders. . . . .
3. Prepare a *Confidential Information Memorandum* on [FMC] which is specifically drafted to support the type of transaction structure which meets the Shareholder[s'] cultural preferences and financial expectations . . . . .
4. Approach these target investors on a non-disclosed basis to determine their strategic interest in acquiring an origination platform with [FMC's] characteristics.  Obtain an NDA from those lenders whose interest level has been sufficiently confirmed.
5. Upon receipt of an executed NDA, distribute the *Confidential Information Memorandum* to each qualified prospective buyer.
6. Schedule, coordinate and conduct get-acquainted conference calls with the most qualified/motivated prospective buyers.

7.  Transition the discussions into negotiations with one or more of the most promising buyer candidates

    a.  Support the negotiations with quantitative analysis, performance benchmarking, etc.

    b.  Provide industry metrics/guidelines on M&A transactions, valuation methodology and related deal terms

8.  Support [FMC] in preparing for the buyer's conduct of due diligence

    [Note that STRATMOR's role in the actual conduct of due diligence must be limited because it has a financial stake in the outcome]

9.  Serve as a resource to the eventual buyer's attorneys in the preparation of a *Definitive Purchase Agreement*.

*Id.* at 3.

The Engagement Letter sets forth target dates for certain events, including discussions with qualified buyers, negotiation and execution of a letter of intent between FMC and a buyer, the buyer beginning its due diligence, and execution of a purchase agreement. *See id.* at 4. The Engagement Letter also includes a schedule of fees owed to STRATMOR and provides that "during the term of this engagement . . . all go-forward activity involving prospective mortgage company buyers will be funneled through and handled by STRATMOR." *Id.* at 4-6.

### C.  The Initial Search for a Buyer

Following the execution of the Engagement Letter, STRATMOR identified "dozens of companies" and procured four letters of intent for the sale of FMC. Cameron Dep. 32:5-23. McCord primarily considered two firms as suitable buyers: Academy Mortgage ("Academy") and Eli Global. McCord Dep. 104:11-107:25. A sale of FMC to Academy would have been structured as a sale of FMC's assets, with McCord being retained as a mid-level executive in Academy. *See id.* at 105:17-106:5. A sale to Eli Global would have

6

been structured as a membership interest purchase agreement, in which Eli Global would buy out McCord's equity stake in FMC and would allow McCord to stay on as the head of FMC. *See id.* at 104:11-105:5. McCord ultimately chose to pursue the Eli Global deal as more "attractive to [McCord] for [McCord's] employees," although the sale to Academy would have been more lucrative to McCord personally. *Id.* at 106:6-24; Pl.'s Resp. at 12.

### D. The Failed Eli Global Deal

In May 2015, prior to FMC's engagement with STRATMOR, a representative of Eli Global had contacted McCord to discuss a potential transaction with FMC. McCord Dep. 57:11-19. During the initial FMC-STRATMOR talks, McCord apprised Cameron and Babcock of the prior contact. Babcock informed McCord that, although STRATMOR was already representing Eli Global on the buy side, it could still represent FMC on the sell side. *Id.* at 57:11-58:18.

On January 6, 2017, Eli Global and FMC executed a nonbinding letter of intent (the "Term Sheet") regarding a stock acquisition of FMC by Eli Global. *See* Term Sheet (Doc. No. 47-4). Under its terms, Eli Global would buy all shares of FMC and enter into an employment agreement with McCord. *See id.* at 1. FMC agreed to negotiate exclusively with Eli Global until the earlier of March 31, 2017, or the closing of a transaction, and Eli Global agreed to use commercially reasonable efforts to deliver a draft purchase agreement by January 31, 2017, and close the transaction by February 28, 2017. *See id.* at 1-2. Upon closing, FMC would terminate all its existing warehouse facilities and enter into a separate warehouse facility agreement with an affiliate of Eli Global. *See id.* at 1. The Term Sheet

contemplated Eli Global performing "usual and customary due diligence" on FMC prior to closing the transaction. *Id.* at 2.

On March 29, 2017, FMC entered into an Extension of Exclusivity agreement with Eli Global, extending the exclusive negotiation period from March 31, 2017, to June 30, 2017. *See* Extension of Exclusivity Agreement (Doc. No. 47-6).

On March 31, 2017, FMC's warehouse lines with American Southwest expired. McCord Dep. 164:2-5. That same day, CapLOC, an affiliate of Eli Global, started funding FMC loan closings pursuant to a March 30, 2017 agreement (the "Service Agreement") between FMC, CapLOC, and CBB, Inc. (an affiliate of American Southwest). *Id.* at 52:13-53:16.

On May 15, 2017, Eli Global sent a Demand Letter to CBB, Inc., copying FMC's general counsel. *See* Demand Letter (Doc. No. 47-7). The Demand Letter stated that CBB, Inc. had violated the Service Agreement by verifying and disbursing over $34 million in fraudulent loans that were transferred by FMC to CapLOC. *See id.* at 1; *see also* McCord Dep. 28:25-30:20, 33:6-34:20; Pl.'s Resp. at 14. On June 1, 2027, Eli Global emailed FMC's general counsel and others and noted a concern regarding a $17 million deficit in FMC's escrow funds "caused by [McCord]." June 1, 2017 Email (Doc. No. 47-8). Following CapLOC's identification of these issues, Eli Global insisted on a new FMC purchase contract, as well as a new employment contract for McCord, and threatened to stop funding FMC's new loans if McCord did not sign the revised contracts. McCord Dep. 70:17-71:20. When McCord refused to negotiate further, CapLOC stopped funding FMC's

new loans, and McCord terminated negotiations with Eli Global on June 6, 2017.  *Id.* at 188:22-189:13, 199:15-201:19.[3]

### E.  STRATMOR's Internal Concerns About Eli Global

Plaintiff contends that after the Eli Global deal fell through, FMC and McCord learned for the first time that Defendants had material knowledge regarding Eli Global that it had not disclosed to FMC during the negotiations.  *See* Am. Compl. ¶¶ 26-27; McCord Dep. 49:25-50:8, 92:7-93:3.  Specifically: Defendants were aware of ongoing litigation involving Eli Global; Defendants believed that Eli Global's "strategy is not well-formulated and [Eli Global] lack[s] mortgage expertise"; and Defendants had concerns about Eli Global attempting to change the terms of executed letters of intent with other parties.  McCord Dep. 109:11-110:12; Pl.'s Exs. 4, 5, 6, 7, 8 (Doc. Nos. 50-4, 50-5, 50-6, 50-7, 50-8).

### F.  The Failed Academy Deal

Following the lapse of the Eli Global transaction, FMC and STRATMOR attempted to resurrect a deal with Academy.  McCord Dep. 80:25-81:5.  According to McCord,

---

[3] On June 3, 2020, a federal grand jury indicted McCord, charging him with bank fraud in violation of 18 U.S.C. § 1344, making a false statement to a financial institution in violation of 18 U.S.C. § 1014, and money laundering in violation of 18 U.S.C. § 1957(a). *See United States v. McCord*, No. CR-20-121-C (W.D. Okla.), Indictment (Doc. No. 1).  McCord pled guilty to five of the criminal counts, and on November 30, 2021, McCord was convicted and sentenced to a total term of 104 months' imprisonment, as well as almost $52 million in restitution. *See id.*, J. (Doc. No. 54).  As relevant here, McCord admitted to defrauding the banks affiliated with American Southwest through the use of out-of-trust loans, making false statements to CapLOC for the purpose of influencing CapLOC's actions, and defrauding another financial institution by transferring escrow funds from FMC's clearing account to FMC's operating account. *See id.*, Plea Pet. (Doc. No. 32).

Academy was delighted to have a second chance at acquiring FMC's assets. *See id.* at 189:15-190:4. Because "the sale deal was made under duress," McCord agreed to a purchase price of $10 million for FMC's production platform, although Academy had previously offered $20 million. *Id.* at 215:24-216:11. Closing was set for August 1, 2017. *Id.* at 81:6-8.

The closing with Academy did not go through, however, because CapLOC filed a lawsuit on July 31, 2017, against FMC and other entities in connection with the fraudulent loans transferred under the Service Agreement. *Id.* at 81:9-13. McCord testified that he recommended to Academy that their agreement be terminated due to the litigation and that Academy agreed that it did not want to be involved. *Id.* at 81:1-82:5. Academy eventually took over much of FMC's operations; however, minimal consideration, if any, was paid by Academy to FMC. *Id.* at 82:6-84:5. McCord has not sued Academy for compensation for FMC's production platform or employees. *Id.* at 84:6-8.

## III.   Discussion

Plaintiff now asserts that STRATMOR, Cameron, and Babcock are liable for their alleged failure to properly conduct due diligence on Eli Global and failure to disclose information known by Defendants about Eli Global's litigation and finances to FMC. *See* Am. Compl. ¶¶ 31-55. Plaintiff alleges that Defendants' improper actions "caused significant damages to Plaintiff including, but not limited to, the cessation of Plaintiff's business operations" and Plaintiff being "forced to sell its business for pennies on the dollar to another buyer after losing its ability to obtain warehouse funding " *Id.* ¶¶ 30, 36, 43. Plaintiff further asserts Defendants' actions harmed Plaintiff because: "Plaintiff would not

10

have entered into the [letter of intent] with [Eli Global]" had Defendants "disclosed the full extent of their knowledge about [Eli Global] to Plaintiff" and "upheld their obligations under the Engagement Letter." *Id.* ¶¶ 48, 52, 55.

Plaintiff brings claims in this diversity action sounding in fraud, deceit, breach of fiduciary duty, negligence, and breach of contract. *See id.* ¶¶ 30-55. Defendants move for summary judgment on all claims. *See* Defs.' Mot. at 9.

### A. Governing Law

#### i. Plaintiff's Tort Claims

In diversity actions, choice of law is determined by the law of the forum state, in this case Oklahoma. *See Elec. Distribs., Inc. v. SFR, Inc.*, 166 F.3d 1074, 1083 (10th Cir. 1999). "Oklahoma choice of law rules require the court to apply the tort law of the state with the most significant relationship to the occurrence and to the parties." *BancOklahoma Mortg. Corp. v. Cap. Title Co.*, 194 F.3d 1089, 1103 (10th Cir. 1999). Relevant factors include "(1) the place where the injury occurred, (2) the place where the conduct causing the injury occurred, (3) the domicile, residence, nationality, place of incorporation and place of business of the parties, and (4) the place where the relationship, if any, between the parties occurred." *Id.* at 1103-04 (internal quotation marks omitted).

Applying these factors, the Court concludes that Oklahoma has the most significant relationship to this dispute. Plaintiff is an Oklahoma limited liability corporation with its principal place of business in Oklahoma. Though much of the negotiation, interaction, and correspondence between Plaintiff and STRATMOR occurred over email, *see, e.g.,* Cameron Dep. 27:20-25, at least one in-person meeting occurred in Oklahoma City. *See*

11

*id.* at 51:3-52:4.  Because Plaintiff and Defendants vary in their residences and places of incorporation and business, this factor is a wash.  *See* Am. Compl. ¶¶ 1-4.  Finally, the Court finds that STRATMOR's role as Plaintiff's representative and "exclusive transaction advisor" reflects a relationship centered in Oklahoma, such that Oklahoma law should apply to Plaintiff's tort claims.  *See BancOklahoma Mortg. Corp.*, 194 F.3d at 1103-04.

### ii.    Plaintiff's Contract Claims

Under Oklahoma law, "unless the contract terms provide otherwise, the nature, validity, and interpretation of a contract are governed by the law where the contract was made."  *Harvell v. Goodyear Tire & Rubber Co.*, 164 P.3d 1028, 1033-34 (Okla. 2006).  Here, the Engagement Letter was executed virtually by the parties.  *See* Cameron Dep. 22:2-23:9, 51:3-14.  It is not clear from the record where the parties were located when the Engagement Letter was executed or in what sequence the parties signed it.  Accordingly, the Court is unable to determine under *Harvell* which state's law should apply.  Nor does the Engagement Letter include a choice-of-law provision.

The parties appear to agree that Oklahoma law should apply, however.  Defendants exclusively cite decisions applying Oklahoma law in their arguments regarding Plaintiff's breach of contract claims, and Plaintiff does not dispute that Oklahoma law governs.  Accordingly, the Court assumes that Oklahoma law applies to Plaintiff's contract claims.  *See NeoChild, LLC v. Adventist Health Sys. Sunbelt Healthcare Corp.*, No. CIV-20-588-F, 2020 WL 4937123, at *2 n.3 (W.D. Okla. Aug. 24, 2020).

### B. Defendants' Motion for Summary Judgment

Plaintiff alleges various claims lying in tort: fraud or deceit,[4] breach of fiduciary duty, and negligence. *See* Am. Compl. ¶¶ 31-52. Although the elements for each tort vary, each claim at bottom requires Plaintiff to prove that Defendants were the cause of Plaintiff's alleged injury. For fraud or deceit, Plaintiff must show that it "suffered injury as a result of" Defendants' false representation or failure to disclose—i.e., that Plaintiff relied upon Defendant's action "to [its] own detriment." *Lillard*, 267 F. Supp. 2d at 1112; *Schlanger Ins. Tr. v. John Hancock Life Ins. (U.S.A., Inc.)*, 897 F. Supp. 2d 1109, 1118 (N.D. Okla. 2012) (internal quotation marks omitted); *see also* Okla. Unif. Civ. Jury Instr. Nos. 18.1, 18.2. For breach of fiduciary duty, Plaintiff must establish that Defendants' breach of a fiduciary duty owed to Plaintiff "was the direct cause of damages." *Gray v. Acadia Healthcare Co.*, No. 19-cv-00338, 2020 WL 5996418, at *9 (E.D. Okla. Oct. 9, 2020). And for negligence, Plaintiff must prove that its injuries were "'proximately caused by [Defendants'] failure to exercise [their] duty of care.'" *Id.* (quoting *Thompson v. Presbyterian Hosp., Inc.*, 652 P.2d 260, 263 (Okla. 1982)).

Summarizing Oklahoma law, the Tenth Circuit has explained:

"The proximate cause of an event must be that which in a natural and continuous sequence, unbroken by an independent cause, produces the event and without which the event would not have occurred." *Gaines v. Providence Apartments*, 750 P.2d 125, 126-27 (Okla.1987) (citing *Beesley v. United States*, 364 F.2d 194 (10th Cir. 1966) and cases cited there). "Where

---

[4] Under Oklahoma law, "the basic elements of common law fraud and deceit are identical" and courts generally treat these claims as synonymous, evaluating them together as a fraud claim. *Lillard v. Stockton*, 267 F. Supp. 2d 1081, 1111 (N.D. Okla. 2003); *see Hitch Enters., Inc. v. Cimarex Energy Co.*, 859 F. Supp. 2d 1249, 1259 (W.D. Okla. 2012).

the negligence complained of only creates a condition which thereafter reacts with a subsequent, independent, unforeseeable, distinct agency and produces an injury, the original negligence is the remote rather than the proximate cause thereof." *Gaines*, 750 P.2d at 127. "This is held to be true though the injury would not have occurred except for the original act." *Beesley*, 364 F.2d at 196 (citing Oklahoma cases).

*Henry v. Merck & Co.*, 877 F.2d 1489, 1494 (10th Cir. 1989).

To recover on its claim for breach of contract, Plaintiff likewise must demonstrate "damages as a direct result of the breach." *Digit. Design Grp., Inc. v. Info. Builders, Inc.*, 24 P.3d 834, 843 (Okla. 2001); *see also* Okla. Stat. tit. 23, § 21 (prescribing that the measure of damages for breach of contract "is the amount which will compensate the party aggrieved for all the detriment proximately caused thereby, or which, in the ordinary course of things, would be likely to result therefrom"). "Although the principles of legal causation sometimes receive labels in contract analysis different from the 'proximate causation' label most frequently employed in tort analysis, these principles nevertheless exist to restrict liability in contract as well." *Webco Indus., Inc. v. Diamond*, No. 11-CV-774, 2012 WL 5995740, at *7 (N.D. Okla. Nov. 30, 2012).

Though Plaintiff brings forward multiple theories of Defendants' liability, all are rooted in the same premise: if Defendants had properly performed due diligence and had properly informed FMC of its internal knowledge and opinions about Eli Global, McCord would have avoided or terminated the letter of intent between Eli Global and FMC, pursued and successfully completed the initial $20 million deal with Academy instead, and used those proceeds to pay off the out-of-trust loans. *See* Pl.'s Resp. at 17; Am. Compl. ¶¶ 27, 29-30, 36, 43, 48, 55; McCord Dep. 92:7-94:20, 92:7-93:6; 160:4-14, 204:14-22, 215:20-

14

217:9, 224:2-226:8.  In sum, Plaintiff believes that "FMC's injury was getting into a deal with Eli Global instead of Academy."  Pl.'s Resp. at 30; *see* McCord Dep. 160:12-14 ("[H]ad I not gone to Eli Global[], we wouldn't be sitting here today.").

Defendants argue that Plaintiff is unable to establish causation as to any of its claims because Plaintiff's own conduct, rather than any improper action by Defendants, directly or proximately caused Plaintiff's failure to sell FMC to Academy at the initial proposed price.  *See* Defs.' Mot. at 28-31, 33, 34.

The Court agrees with Defendants insofar as, even construing all facts in Plaintiff's favor, Plaintiff's theory of causation is overly speculative and improperly places responsibility upon Defendants for Plaintiff's own conduct.  Even assuming that Defendants breached a duty owed to Plaintiff by negligently or fraudulently evaluating Eli Global, or otherwise breached the terms of the Engagement Letter, the injury incurred by Plaintiff—namely, failing to sell to Academy for $20 million—was not directly or proximately caused by such a breach.  Rather, the undisputed record reflects that FMC's own conduct during the negotiations with Eli Global caused that deal to fall through. Specifically, after FMC placed out-of-trust loans on CapLOC's lending line, Eli Global demanded immediate repayment of those loans.  *See* Demand Letter at 1.  Plaintiff does not allege that this demand was improper or was prompted by any action of Defendants. Eli Global also notified FMC of a deficit in escrow funds, which was caused by McCord and not by Defendants.  *See* Email of June 1, 2017, at 1.  Therefore, FMC's conduct—not any action by Defendants—caused Eli Global to change the terms of the prospective deal between FMC and Eli Global.  Because the new terms were not acceptable to McCord,

negotiations between FMC and Eli Global terminated.  Further, it was FMC's failure to repay the fraudulent loans placed with CapLOC, rather than any action taken by Defendants, that resulted in CapLOC filing suit against FMC on July 31, 2017, which— along with McCord's recommendation to Academy to avoid getting involved— undisputedly caused the second proposed Academy deal to fall through.

Plaintiff objects that "a proximate cause is not necessarily immediate" but can be sufficient "if the causes it initiates are each started naturally by the one that precedes it." Pl.'s Resp. at 31; *Jackson v. Jones*, 907 P.2d 1067, 1072 n.18 (Okla. 1995).  But the record before the Court does not reasonably reflect that Defendants' allegedly improper conduct "set in motion" "other causes" of harm to Plaintiff "constituting a complete chain or succession of events." *Jackson*, 907 P.2d at 1072 n.18.  The conduct of Defendants did not trigger the relevant actions of Southwest, Academy, Eli Global, or CapLOC, and the evidence in the record does not reflect that these entities conducted themselves unlawfully with regard to Plaintiff.  Although causation is generally a question of fact, "the question becomes an issue of law when there is no evidence from which a jury could reasonably find the required proximate, causal nexus between the careless act and the resulting injuries." *Henry*, 877 F.2d at 1495; *accord Jackson*, 907 P.2d at 1073.  Here, Plaintiff's theory of causation fails as a matter of law because it links Defendants to the claimed injury at only the broadest and most conjectural level—i.e., if Defendants had learned and disclosed more about Eli Global, then FMC would have ended that negotiation sooner and would not have placed fraudulent loans on CapLOC's lending lines and instead would have pursued a deal with Academy and would have closed the deal with Academy (despite

16

having out-of-trust loans somewhere on its books) and paid off the out-of-trust loans and kept doing business. *See* McCord Dep. 106:6-107:25 ("I could have killed the deal with Eli Global in . . . April of 2017. I could have resurrected Academy or any other potential choice I had. There would have been no out of trust loans at American Southwest or CapLOC because they would have been paid in full as we discovered them . . . ."); *see also id.* at 92:7-94:21, 155:1-10.

Defendants here, at most, "create[d] a condition which thereafter react[ed] with a subsequent, independent, unfor[e]seeable, distinct agency and produce[d] an injury." *Gaines*, 750 P.2d at 127. Because a jury could not reasonably find that such conduct constitutes direct or proximate cause, Defendants cannot be held liable for Plaintiff's failure to close the advantageous deal with Academy. There being no genuine factual dispute that is material to causation,[5] Defendants are entitled to judgment as a matter of law on Plaintiff's claims.[6]

---

[5] Based on this determination, the Court does not reach Defendants' argument (raised in the Reply) that Plaintiff's conduct was a supervening cause of the harm or the other arguments presented in Defendants' Motion for Summary Judgment.

[6] Though not specifically raised in the summary-judgment briefing, any recovery by Plaintiff on these claims likely would be precluded as contrary to Oklahoma public policy, which prohibits parties from recovering a monetary judgment "to indemnify them for their fraud." *Heyman v. Gable, Gotwals, Mock, Schwabe, Kihle, Gaberino*, 994 P.2d 92, 94 (Okla. Civ. App. 1999); *see* Answer ¶¶ 6-8 (alleging that Plaintiff's claims are barred by fraud, illegality, unclean hands, and McCord's "admitted criminal acts"). Courts enforce this bar "not for the sake of [a] defendant, but because [a court] will not lend its aid" "to a litigant who founds his cause of action upon an immoral or illegal act." *Hunt v. W. T. Rawleigh Med. Co.*, 176 P. 410, 412 (Okla. 1918).

17

CONCLUSION

For the foregoing reasons, Defendants' Motion for Summary Judgment (Doc. No. 47) is GRANTED. A separate judgment shall be entered.

IT IS SO ORDERED this 30th day of March, 2026.

_____
CHARLES B. GOODWIN
United States District Judge